

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | | |
|---|---|---|
| ADRIAN MORIEL, | ) | No. SA CV 15-1356-PLA |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, ACTING | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on August 26, 2015, seeking review of the Commissioner's denial of his application for Supplemental Security Income ("SSI") payments.  The parties filed Consents to proceed before the undersigned Magistrate Judge on August 28, 2015, and September 16, 2015.  Pursuant to the Court's Order, the parties filed a Joint Stipulation (alternatively "JS") on May 20, 2016, that addresses their positions concerning the disputed issues in the case.  The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## BACKGROUND

Plaintiff was born on April 3, 1976. [Administrative Record ("AR") at 236, 385, 389.] He has no past relevant work experience.  [AR at 93, 235.]

On March 29, 2010, plaintiff filed an application for a period of disability and disability insurance benefits ("DIB"), and an application for SSI payments, alleging that he has been unable to work since April 1, 1995.  [AR at 197; JS at 2.]  After his applications were denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ").  [AR at 197, 276.]  A hearing was held on July 28, 2011 ("2011 Hearing"), at which time plaintiff appeared represented by an attorney, and testified on his own behalf.  [AR at 138-88.]  A vocational expert ("VE"), and a medical expert ("ME"), Craig C. Rath, Ph.D., a licensed clinical psychologist, also testified.  [AR at 142-47, 150-54, 160-61, 167-69, 178-84.]  Plaintiff's sister, Marina Diaz, also testified.  [AR at 170-77.]  At the 2011 Hearing, plaintiff withdrew his claim for DIB.  [AR at 186-87.]  On December 23, 2011, the ALJ issued a decision concluding that plaintiff was not under a disability at any time "from the alleged onset date through the date of [the] decision" ("2011 Decision").  [AR at 197-207.]  Plaintiff requested review of the ALJ's decision by the Appeals Council.  [AR at 324-25.]  The Appeals Council remanded the matter with instructions [AR at 214-17], and a second hearing was held on February 25, 2014 ("2014 Hearing"), before the same ALJ.  [AR at 46-101.]  Plaintiff appeared represented by an attorney, and again testified on his own behalf.  [Id.]  A VE and Dr. Rath also testified.  [AR at 48-78, 93-97.]  At the 2014 Hearing, plaintiff changed his disability onset date to March 29, 2010, the date he filed his application for SSI.  [AR at 46.]  On April 8, 2014, the ALJ issued a decision concluding that plaintiff was not under a disability at any time since March 29, 2010, the date the application was filed.  ("2014 Decision").  [AR at 222-37.]  When the Appeals Council denied plaintiff's request for review on July 25, 2015 [AR at 1-5], the ALJ's 2014 Decision became the final decision of the Commissioner.  See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted).  This action followed.

/

**III.**

**STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008) (citation and internal quotation marks omitted); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) (same).  When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence.  Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (citation omitted); see Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (citation and internal quotation marks omitted).  "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Ryan, 528 F.3d at 1198 (citation and internal quotation marks omitted); see Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the ALJ's conclusion, [the reviewing court] may not substitute [its] judgment for that of the ALJ.") (citation omitted).

**IV.**

**THE EVALUATION OF DISABILITY**

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.

3

1    1992).

2

3    **A.    THE FIVE-STEP EVALUATION PROCESS**

4    The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing

5    whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821,

6    828 n.5 (9th Cir. 1995), as amended April 9, 1996.  In the first step, the Commissioner must

7    determine whether the claimant is currently engaged in substantial gainful activity; if so, the

8    claimant is not disabled and the claim is denied.  Id.  If the claimant is not currently engaged in

9    substantial gainful activity, the second step requires the Commissioner to determine whether the

10   claimant has a "severe" impairment or combination of impairments significantly limiting his ability

11   to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id.

12   If the claimant has a "severe" impairment or combination of impairments, the third step requires

13   the Commissioner to determine whether the impairment or combination of impairments meets or

14   equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404,

15   subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.  If

16   the claimant's impairment or combination of impairments does not meet or equal an impairment

17   in the Listing, the fourth step requires the Commissioner to determine whether the claimant has

18   sufficient "residual functional capacity" to perform his  past work; if so, the claimant is not disabled

19   and the claim is denied.  Id.  The claimant has the burden of proving that he is unable to perform

20   past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a prima facie

21   case of disability is established.  Id.  The Commissioner then bears the burden of establishing

22   that the claimant is not disabled, because he can perform other substantial gainful work available

23   in the national economy.  Id.  The determination of this issue comprises the fifth and final step

24   in the sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin,

25   966 F.2d at 1257.

26

27   **B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

28   At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since

March 29, 2010, the application date.  [AR at 225.]  At step two, the ALJ concluded that plaintiff has the severe impairments of major depressive disorder, recurrent; and polysubstance dependence.  [Id.]  He found plaintiff's hepatitis C, hyperlipidemia and/or dyslipidemia, and chronic bronchitis to be not severe.  [AR at 225-26.]  At step three, the ALJ determined that plaintiff does not have an impairment or a combination of impairments that meets or medically equals any of the impairments in the Listing.  [AR at 226.]  The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[1] to perform the full range of work at all exertional levels but with the following non-exertional limitations:  "3 to 5 step moderately complex tasks; object oriented, so no working with the general public; avoid stressful environments such as taking complaints; and avoid intrusive supervision."  [AR at 229.]  At step four, the ALJ concluded that plaintiff has no past relevant work.  [AR at 93, 235.]  At step five, based on plaintiff's RFC, vocational factors, and the VE's testimony, the ALJ found that there are jobs existing in significant numbers in the national economy that plaintiff can perform, including work as a "hand packager" (Dictionary of Occupational Titles ("DOT") No. 920.587-018), and an "assembler, plastic hospital parts" (DOT No. 712.687-010).  [AR at 93-94, 236.]  Accordingly, the ALJ determined that plaintiff was not disabled at any time from March 29, 2010, the date his application was filed, through April 8, 2014, the date of the decision.  [AR at 237.]

## V.

## THE ALJ'S DECISION

Plaintiff contends that the ALJ erred when he:  (1) gave great weight to the testimony of the ME, Dr. Rath; (2) rejected the opinion of plaintiff's treating psychiatrist, Bruce Appelbaum, M.D.; (3) considered the testimony of plaintiff's sister, Marina Diaz; (4) rejected plaintiff's subjective symptom testimony; and (5) found plaintiff's impairment of hepatitis C to be nonsevere.  [JS at 3.]

---

[1]   RFC is what a claimant can still do despite existing exertional and nonexertional limitations.  See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity."  Massachi v. Astrue, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007) (citation omitted).

1  As set forth below, the Court agrees with plaintiff, in part, and remands for further proceedings.

2

3  **A.   MEDICAL OPINIONS**

4      **1.     Legal Standard**

5      "There are three types of medical opinions in social security cases:  those from treating

6  physicians, examining physicians, and non-examining physicians." Valentine v. Comm'r Soc. Sec.

7  Admin., 574 F.3d 685, 692 (9th Cir. 2009); see also 20 C.F.R. §§ 404.1502, 404.1527, 416.927.

8  "As a general rule, more weight should be given to the opinion of a treating source than to the

9  opinion of doctors who do not treat the claimant." Lester, 81 F.3d at 830; Garrison v. Colvin, 759

10  F.3d 995, 1012 (9th Cir. 2014) (citing Ryan, 528 F.3d at 1198); Turner v. Comm'r of Soc. Sec.,

11  613 F.3d 1217, 1222 (9th Cir. 2010).  "The opinion of an examining physician is, in turn, entitled

12  to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830; Ryan,

13  528 F.3d at 1198.

14      "[T]he ALJ may only reject a treating or examining physician's uncontradicted medical

15  opinion based on clear and convincing reasons." Carmickle, 533 F.3d at 1164 (citation and

16  internal quotation marks omitted); Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006).

17  "Where such an opinion is contradicted, however, it may be rejected for specific and legitimate

18  reasons that are supported by substantial evidence in the record." Carmickle, 533 F.3d at 1164

19  (citation and internal quotation marks omitted); Ryan, 528 F.3d at 1198; Ghanim v. Colvin, 763

20  F.3d 1154, 1160-61 (9th Cir. 2014); Garrison, 759 F.3d at 1012.  The ALJ can meet the requisite

21  specific and legitimate standard "by setting out a detailed and thorough summary of the facts and

22  conflicting clinical evidence, stating his interpretation thereof, and making findings." Reddick, 157

23  F.3d at 725.  The ALJ "must set forth his own interpretations and explain why they, rather than the

24  [treating or examining] doctors', are correct." Id.

25      Although the opinion of a non-examining physician "cannot by itself constitute substantial

26  evidence that justifies the rejection of the opinion of either an examining physician or a treating

27  physician," state agency physicians are "highly qualified physicians, psychologists, and other

28  medical specialists who are also experts in Social Security disability evaluation."  20 C.F.R. §§

6

404.1527(f)(2)(i), 416.927(f)(2)(i); Soc. Sec. Ruling ("SSR")[2] 96-6p; Bray v. Astrue, 554 F.3d 1219, 1221, 1227 (9th Cir. 2009) (the ALJ properly relied "in large part on the DDS physician's assessment" in determining the claimant's RFC and in rejecting the treating doctor's testimony regarding the claimant's functional limitations).  Reports of non-examining medical experts "may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it."  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

### 2.    Background

#### a.    Dr. Appelbaum's Opinions

On June 27, 2011, Dr. Appelbaum, plaintiff's treating psychiatrist since October 1, 2009, completed a Mental Assessment in which he found the following "severe" functional limitations (defined as an "[e]xtreme impairment of ability to function"):  ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, and maintain regular attendance and punctuality; work in coordination within a proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. [AR at 645-48.] He determined plaintiff had the following "moderately severe" functional limitations (defined as an impairment which "seriously affects ability to function"):  ability to remember locations and work-like procedures; sustain an ordinary routine without special supervision; make simple work-related decisions; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness;

---

[2]    "SSRs do not have the force of law.  However, because they represent the Commissioner's interpretation of the agency's regulations, we give them some deference.  We will not defer to SSRs if they are inconsistent with the statute or regulations."  Holohan v. Massanari, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001) (citations omitted).

be aware of normal hazards and take appropriate measures; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. [Id.] He found the following "moderate" functional limitations (defined as "an impairment which affects but does not preclude ability to function"):  ability to understand, remember, and carry out very short and simple instructions; and ask simple questions or request assistance.  [Id.] Dr. Appelbaum indicated diagnoses of Major Depressive Disorder and Polysubstance Abuse, but also indicated that plaintiff was *not* "presently addicted to alcohol and/or drugs," has a "*history* of use," and claimed to have been clean and sober for six months at that time.[3]  [AR at 648, 649 (emphasis added).]  After the hearing, on August 5, 2011, Dr. Appelbaum submitted a letter stating that the Mental Assessment form he completed on June 27, 2011, "pertains to [plaintiff's] major depressive disorder.  There was no history of abuse of alcohol or drugs during the period he has been treated at College Community Services [from October 1, 2009.]  Therefore, alcohol or polysubstances abuse was not a factor and not material to the level of [plaintiff's] impairment noted on the assessment form." [AR at 650.] On March 11, 2014, Dr. Appelbaum stated that he had reviewed plaintiff's treatment records since the June 27, 2011, assessment, and found that plaintiff's "mental functional capacity remains substantially the same as noted" in the June 2011 Mental Assessment. [AR at 765.]

###          b.    The 2011 Hearing and Decision

At the 2011 Hearing, when asked to list the impairments established "by medically-acceptable clinical and laboratory findings in the record, the ME stated the following:

---

[3]    On August 18, 2011, approximately two months after Dr. Appelbaum's June 2011 assessment, plaintiff told the clinician completing plaintiff's review that he had been clean and sober for six years. [AR at 674.]  Because plaintiff consistently reported that he had been clean and sober between six and seven years [see, e.g., AR at 674 (6 years); 719 (6.5 years); 748 (7 years)], and also testified that he had stopped using drugs and drinking "before the last time [he] went to prison" in 2000 or 2001, and that the statement in the record that he was using marijuana two times per week was not accurate [AR at 148-49], it is entirely possible that Dr. Appelbaum's June 2011 report may have incorrectly stated that plaintiff had been clean and sober for six *months* instead of six *years*; the latter would have been consistent with plaintiff's other reports. In any event, this issue is not determinate herein.

8

Yes, Your Honor, 12.04, other, a diagnosis of depressive disorder not otherwise specified; 12.06(1), A through D, generalized anxiety disorder; 12.09 [Substance Addiction Disorder], present, B criteria of the listings.[4]  Without the 12.09 it would be moderate, moderate, moderate and none.  With the 12.09 it would be marked, marked, marked and none.  No evidence of the C criteria. . . . . Limitations would have mostly to do with complexity of tasks, with a tenth grade education, no more than moderate complexity, three to five steps and then the other source of problems would be the stress reaction that might, might cause anxiety or depression.  So that would be stress from all sources, no inherently stressful job such as taking complaints. . . . I do think that he would have problems with authority figures, supervisors and so on.  So I would not have any stressful, intrusive supervision of any kind.

[AR at 142.]

In the 2011 Decision, the ALJ found that plaintiff's impairments, "including the substance abuse disorders, meet sections 12.04 [depressive disorder], 12.06 [generalized anxiety disorder], and 12.09 [substance addiction disorder] of 20 CFR Part 404, Subpart P, Appendix 1."  [AR at 200.]  He also determined that if plaintiff "stopped the substance use, [he] would not have an impairment or combination of impairments that meets or medically equals any . . . [Listing]."  [AR at 201.]  Accordingly, he concluded that the "substance use disorder is a contributing factor material to the determination of disability because [plaintiff] would not be disabled if he stopped the substance use" and, therefore, "[b]ecause the substance use disorder is a contributing factor material to the determination of disability, [plaintiff] has not been disabled . . . at any time from the alleged onset date through the date of [the] decision."[5]  [AR at 206-07.]

---

[4]    This refers to the paragraph B criteria of Listing 12.09:  restriction of activities of daily living; difficulties in maintaining social functioning; difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.09.  To satisfy a Listing, the mental impairment(s) must result in at least two marked restrictions in these areas.  Here, the ME found marked restrictions in three of the criteria, and no episodes of decompensation. [AR at 142.]

[5]    If an individual only meets the definition of disability because of a substance abuse impairment -- whether on its own or in combination with other impairments -- the substance abuse impairment is "a contributing material factor" to the disability finding, and the Social Security Act requires that an individual "not be considered to be disabled." 42 U.S.C. § 423(d)(2)(C); SSR 13-2p ("drug addiction and alcoholism (DAA) is material to [the] determination of disability if the claimant would not meet the definition of disability if he or she were not using drugs or alcohol").

### c.      The Appeals Council Remand

On July 12, 2013, the Appeals Council remanded the matter for further proceedings.  [AR at 214-17.]  It specifically found that although the ME relied on the *diagnosis* of "polysubstance abuse" as reflected in the medical record "as proof of a listing level impairment," "diagnosis alone does not establish impairment severity particularly where, as here, that diagnosis appears to be drawn from a single reference to a history of alcohol use in April 2006 and a reference to the use of marijuana two times a week in September 2009."  [AR at 215 (citing AR at 535, 546).] Additionally, the Appeals Council noted that Dr. Appelbaum specifically stated in his June 2011 assessment that plaintiff was *not* addicted to drugs or alcohol and, on August 5, 2011, after the hearing, he "submitted a clarifying statement that [plaintiff] had been under his treatment for a major depressive disorder since October 1, 2009 during which time there was no evidence of problems related to the use of alcohol or drugs."  [AR at 215 (citing AR at 644-49, 650).]  It also noted Dr. Appelbaum's clarification "that alcohol or 'polysubstance abuse' was not a factor and was not material" to the level of plaintiff's impairment reflected on his July 2011 assessment form. [Id. (citing AR at 650).]  The Appeals Council further noted that although the ALJ rejected Dr. Appelbaum's opinion as to the severity of plaintiff's mental impairments as set forth in his June 2011 assessment, the ALJ "did not acknowledge or address Dr. App[el]baum's post hearing opinion that 'polysubstance abuse' was not relevant to that assessment."  [Id.]  The Appeals Council additionally stated that during the hearing, Dr. Rath was not able "to point to a single instance in the record in which [plaintiff] was reported to be intoxicated or under the influence of drugs," and the consulting internist and consulting psychiatrist "did not even list 'polysubstance abuse' as a diagnosis."  [Id. (citing AR at 583-88, 589-98).]  As a result, the Appeals Council concluded that a history of alcohol and marijuana use was not established by the record "as a significant factor with respect to the issue of disability," and finding a listing level impairment of polysubstance abuse was not "reasonable or logical, particularly in the face of direct evidence from the treating psychiatrist that drugs and alcohol were not relevant factors in his assessment of [plaintiff's] mental impairments."  [Id.]  Thus, the "elevation of polysubstance abuse to a determinative issue, clouded the entire decision as to the nature, severity and limiting effects of

1    [plaintiff's mental] impairments, as well as the evaluation of the credibility of [plaintiff's] subjective

2    symptoms."  [Id.]

3          Among other things, the Appeals Council ordered the ALJ on remand to obtain updated

4    records from plaintiff's treating sources, including if warranted, a consultative mental status

5    examination[6]; further evaluate plaintiff's subjective complaints and the evidence or testimony of

6    third-party witnesses; further evaluate plaintiff's mental impairments in accordance with the special

7    technique described in 20 C.F.R. § 416.920a; give further consideration to plaintiff's maximum

8    RFC; obtain supplemental evidence from a VE as to occupations plaintiff can perform given his

9    limitations; and conduct further proceedings to determine whether drug addiction and alcoholism

10   are contributing factors material to any finding of disability.  [AR at 216.]

11

12                    **d.      The 2014 Hearing and Decision**

13         At the 2014 Hearing on remand, Dr. Rath again testified.  [AR at 48-77.]  This time, when

14   asked to list the impairments established by medically-acceptable clinical and laboratory findings,

15   the ME stated the following:

16         Yes, Your Honor, 12.04, mood disorder, other/mood disorder, not otherwise
           specified; 12.09 present, B criteria of the listings; restricted activities of daily living
17         would be moderate; social functioning would be moderate; concentration,
           persistence or pace would be moderate; decompensation would be none; no
18         evidence of the C criteria.

19   [AR at 48.]  The ME also testified that in various treatment records, plaintiff had been given a

20   diagnosis of polysubstance dependence.  [AR at 49-52 (citing AR at 545-46, 548, 549, 550).]

21   When the ALJ asked Dr. Rath whether he saw "the polysubstance as present and material at this

22   time," the ME -- not precisely answering the question asked -- testified that "give[n] the diagnoses,

23   polysubstance dependence and polysubstance abuse, on a continual basis, would affect his

24   medication and his behavior, but his usage has not been anything like it was in the distant past

25   and he is noted by Dr. App[el]baum to have improved considerably."  [AR at 52.]  Dr. Rath

26   concluded that plaintiff has anger issues and angrily acts out when under stress, so would need

27   _____

28         [6]   On remand, the ALJ did not order a consultative mental status examination.

1   a "relatively low-stress job, meaning no inherently stressful jobs such as taking complaints and no

2   intrusive supervision that would cause . . . an inordinate amount of stress." [AR at 51-52.] He

3   opined that plaintiff "could do moderately complex, three to five-step tasks.  He talks about going

4   back to get his GED, a high school equivalency, having dropped out because of behavioral

5   difficulties, with no evidence of cognitive difficulties." [AR at 52.]  The ALJ gave "great weight" to

6   Dr. Rath's 2014 Hearing testimony:

> Based on his review of the medical records, Dr. Rath opined [plaintiff] has the
> capacity for work within the mental limitations detailed in the [RFC] above with the
> exception of the "object oriented" limitation.  Dr. Rath testified [plaintiff] would need
> to limit his exposure to stress and that his cognitive capacity would allow for
> moderately complex tasks because of his demonstrated ability to get his high school
> equivalency after previously dropping out.[7]  Dr. Rath testified that his opinion
> included the co-effects of poly-substance disorder because of the continued

---

7   This statement mischaracterizes Dr. Rath's testimony, as well as the facts.  Plaintiff completed the tenth grade in 1991 [AR at 437], but did not ever state that he later obtained his GED.  Indeed, Dr. Rath did not testify as to plaintiff's "demonstrated ability" to do moderately complex tasks based on plaintiff's *completion* of a GED, but instead stated, without referring to any specific record: "It *looks like* cognitively he could do moderately complex, three to five-step tasks. He talks about *going back* to get his GED . . . having dropped out because of behavioral difficulties, with no evidence of cognitive difficulties." [AR at 52 (emphases added).]  The ME therefore apparently concluded that (1) plaintiff's *desire* to get his GED provides support for the ME's assessment that plaintiff can perform moderately complex, three to five step tasks, and/or (2) plaintiff's alleged reasons for dropping out of high school provide that support.  However, plaintiff's alleged belief that he may be able to complete his GED is irrelevant to his actual cognitive abilities, and the ME's conjectures regarding plaintiff's reasons for dropping out of high school are unsupported in the record. Although plaintiff indicated that he received a certificate for completing an electrician training program around 2007, plaintiff explained that he completed this training in either 2006 or 2007 with a "lot of help" from the teachers and other students, several years before plaintiff's application for SSI was filed.  [See AR at 159, 437.]  Additionally, although the consultative psychiatrist, Dr. Bagner, assessed on June 23, 2010, that plaintiff would have no limitations completing simple tasks, and mild limitations completing complex tasks [AR at 593], the two state agency psychiatric consultants, on July 9, 2010, and December 6, 2010, both found plaintiff limited to simple repetitive tasks.  [AR at 232 (citing AR at 602, 613, 617).]  The ALJ gave Dr. Bagner's opinion "some but not full weight" because it only addressed "the severity of [plaintiff's] impairments while not considering" plaintiff's work capacity, or plaintiff's substance use history [AR at 231-32]; he gave the state agency consultants' opinions "less weight" because their "limitation to simple repetitive tasks does not match [plaintiff's] observed cognitive capacity" based on Dr. Bagner's examination, "and a reading of the full medical evidence of record." [AR at 232.]  The Court notes that one of the state agency consultants considered plaintiff's substance use to be in "remission." [AR at 609 (July 9, 2010 report noting "poly remission")], and the other, like Dr. Bagner, did not mention plaintiff's polysubstance dependence/abuse diagnoses. [AR at 616-17.]

1    diagnosis of poly-substance abuse and dependence.  Even when his qualifications
     on his capacity to testify objectively when the medical file contained references to
2    substance use disorders, Dr. Rath's testimony that he does not always testify that
     substance use disorders are material to the determination of disability showed he
3    is qualified to testify and not biased against individuals who use illicit substances.
     While Dr. Rath did not testify to the need for an object oriented work environment,
4    the remainder of his limitations are supported by the full medical evidence of record.

5    [AR at 231.]

6           This time, and contrary to his 2011 conclusion that plaintiff's "impairments, including the

7    substance use disorders, meet sections 12.04, 12.06, and 12.09" of the Listings, the ALJ

8    determined that plaintiff did *not* meet or medically equal Listing 12.04 or 12.09[8] as he only has

9    moderate restrictions in his activities of daily living, social functioning, and concentration,

10   persistence, or pace.  [AR at 226-27.]  He also specifically determined that there was no need "for

11   a full 'Drug Addiction and Alcoholism' analysis [pursuant to SSR 13-2p] because [plaintiff] is not

12   'disabled' when considering the co-effects of the substance use disorder."  [AR at 229.]

13

14        **3.     Analysis**

15             **a.     Weight Given to Dr. Rath's Opinion**

16          Plaintiff contends that the ALJ erred when he gave the ME's 2014 Hearing testimony "great

17   weight."  [JS at 13-14.]  Specifically, plaintiff argues that at the 2014 Hearing, the ME again

18   testified that he found substance abuse "despite the Appeals Council's finding that this was not

19   reasonable" and, therefore the ME's testimony is not credible "since he continues to assert

20   something that is not possible."  [JS at 4 (citing AR at 48).]  He also argues that the ME also gave

21   "other false . . . or unreliable testimony," in that although he testified at the 2011 Hearing that

22   plaintiff had three marked functional impairments (which, based on the Appeals Council's remand

23   order, plaintiff argues could *not* have been the result of *actual* substance abuse),[9] on remand Dr.

24   _____

25   [8]    Although in 2011 the ALJ determined plaintiff also met Listing 12.06 (anxiety related
     disorders), it does not appear that he considered Listing 12.06 in 2014.

26   [9]    Plaintiff argues that "the ME unequivocally testified in 2011 that the medical evidence
27   supported three marked limitations."  [JS at 4.]  He contends that "if there was no material
     substance abuse [as the Appeals Council found], then [plaintiff] should still have the marked
28                                                                    (continued...)

1   Rath testified that plaintiff's combined impairments never met a Listing and that his testimony in
2   2014 was not different from his testimony at the 2011 Hearing.  [JS at 4-5 (citing AR at 74).]
3   Plaintiff further argues that the ME failed to acknowledge or explain why his testimony changed,[10]
4   and the ALJ's post-hoc reasoning -- that the ME's earlier testimony was based on a less complete
5   medical record [AR at 231] -- is not supported by substantial evidence because none of the
6   additional records submitted on remand is dated prior to the ME's 2011 Hearing testimony.  [AR
7   at 5-6.]  Therefore, plaintiff argues that those records could not constitute evidence that would
8   have affected or changed the ME's *2011* Hearing testimony, and, at most, the later-submitted
9   records might reveal that plaintiff showed improvement after July 2011.  [AR at 5-6.]  Based on
10  the foregoing, plaintiff argues that the ME's testimony is inconsistent and not credible and,
11  therefore, does not constitute substantial evidence.  [Id.]

12      Defendant counters that the ALJ, in fact, recognized that Dr. Rath's 2011 and 2014 Hearing
13  opinions differed and, therefore, gave "little weight" to Dr. Rath's 2011 Hearing testimony because
14  it was based on records only through July 2011.  [JS at 9 (citing AR at 231).]  The ALJ
15  acknowledged that Dr. Rath testified at the 2014 Hearing that "the most recent records show
16  significant and generally sustained improvement in [plaintiff's] condition," and it is only that
17  testimony to which the ALJ gave "great weight."  [AR at 231 ("The undersigned gives little weight
18  to Dr. Rath's opinion as given in the prior hearing because that was made based on a less
19  complete medical file.").]

20      The Court generally agrees with plaintiff that Dr. Rath's 2014 Hearing testimony is not
21  consistent with his 2011 Hearing testimony.  The Appeals Council did not, however, as plaintiff
22  suggests, determine that *a finding of substance abuse itself* "was not reasonable" or "not possible."

23  _____

24      [9](...continued)
25  impairments testified to by the ME because he already testified that the record supported a
    marked impairment in the B criteria."  [Id.]

26  [10]   In fact, Dr. Rath testified that his testimony in 2014 was different from his 2011 testimony
27  "because [plaintiff] has improved," and reports "no depression, anxiety or mood swings; no suicidal
    ideation; [and] no homicidal . . . ideation," among other things.  [AR at 61-64 (citations omitted).]
28

[See JS at 4.]  It only determined that plaintiff's *diagnoses* of substance dependence/abuse did not by themselves establish *Listing-level severity*, and that substance dependence/abuse was not established by the record "as a significant factor with respect to the issue of disability."  [AR at 215.]  This does not change the fact, however, that at the 2011 Hearing, Dr. Rath testified -- based on his review of the record evidence to that point and taking into account plaintiff's substance dependence -- that plaintiff had "marked" limitations in three functional areas.  [AR at 142; see also AR at 152-54 (clarifying that if he assumed substance use was not a factor, then plaintiff's degree of impairment would be moderate in the three functional areas and explaining that his testimony differed from Dr. Appelbaum's opinion because "the treating doctor doesn't have him clean and sober"[11]).]  In support of his testimony that the record established marked limitations in three of the functional areas, he generally referred to records showing plaintiff was positive for alcohol usage in 2006 [AR at 535], and was diagnosed with major depressive disorder and polysubstance dependence in March 2010.  [AR at 142-43 (citing AR at 545, 546, 547-48, 551, 554, 556-57, 592, 621-27, 628-29, 645-49).]

Considering all of plaintiff's treating records, including those added after the 2011 Hearing, Dr. Rath at the 2014 Hearing again found a severe impairment of polysubstance abuse, again seemingly based entirely upon the diagnoses reflected in Dr. Appelbaum's treatment records and the one entry that plaintiff smoked marijuana about 2 times a week and had 2-3 beers a month.  [See, e.g., AR at 48, 50, 66.]  Yet, this time -- generally in accordance with the Appeals Council's findings -- he testified that plaintiff's limitations in the same three functional areas that he previously found to be "marked," were now only "moderate" impairments.  [AR at 48-50 (citing AR at 545-52, 560, 589-93, 622-30, 632, 634, 645-49, 685); see also AR at 142.]  After much effort on the part of plaintiff's counsel to further inquire into the specifics of Dr. Rath's 2014 Hearing opinion [see AR at 52-77], as well as somewhat "leading" statements made by the ALJ during

---

[11]   Dr. Rath misstates Dr. Appelbaum's opinion.   In his June 27, 2011, assessment Dr. Appelbaum actually stated that plaintiff was not "presently addicted to alcohol and/or drugs," and that although plaintiff has a history of use he claims to have been clean and sober for six months. [AR at 649.]  Thus, Dr. Appelbaum *did* "have [plaintiff] clean and sober."  [Id.]

counsel's questioning of the ME [see, e.g., AR at 54, 55-56, 58, 69], Dr. Rath continued to insist that the diagnoses in the record of polysubstance dependence/abuse are *not* reflective only of history, and plaintiff's admission to marijuana and alcohol use, given his diagnoses, reflects on plaintiff's credibility. [See AR at 56, 59, 66.] Then, when asked to assume that the diagnoses of polysubstance dependence/abuse appearing multiple times in the record were "only a statement regarding past history," and whether based on that assumption Dr. Rath would find "any use of drugs or alcohol to be material," Dr. Rath dodged the question and stated that he "would have to find that the diagnoses are done incorrectly." [AR at 59.] When further pressed to explain why his opinion about plaintiff's limitations had changed from marked to moderate between 2011 and 2014, Dr. Rath did not in any way qualify his 2011 Hearing testimony, and instead replied, "[b]ecause [plaintiff] has *improved*."[12] [AR at 62-63 (emphasis added).] In support, Dr. Rath referred to plaintiff's most recent treatment record dated September 23, 2013, which stated "[t]he patient reports generally doing well; no depression, anxiety or mood swings; no suicidal ideation; no homicidal . . . ideation," among other things. [AR at 62-63 (citing AR at 753).] Plaintiff's counsel then directed Dr. Rath to an August 20, 2013, treatment record -- a month prior -- which reflects, among other things, that due to symptoms of depressed mood and feelings of worthlessness, plaintiff does not aspire to financial independence, has symptoms of anxiety, difficulty coping socially, isolates, has low frustration tolerance, exhibits distractibility and disorganized thinking, and is not able to effectively reach out to others and learn new ways to cope with his social anxiety. [AR at 63-65 (citing AR at 748, 750-51).] Plaintiff's counsel and the ME then spent some time pointing out competing examples of positive and negative mental health findings in the more recent treatment records. [See AR at 65-73 (citations omitted).] For instance, the ME referred to a July 19, 2012, treatment visit where plaintiff reported he was "doing good," and was generally doing well with no depression, anxiety, or mood swings [see AR at 69 (citing AR at 693)], and counsel responded by pointing to a June 22, 2012, treatment note (one month

---

[12]    The ALJ specifically acknowledged that Dr. Rath's testimony at the 2014 Hearing "differed from his testimony at the prior hearing." [AR at 231.]

earlier) stating that plaintiff had "suspicious lesions on his face indicating he might be picking on his skin r/t [related to] depression [symptoms]" [AR at 72 (citing AR at 692)].  [AR at 65-73.]

In short, the 2014 Hearing testimony of the ME does little to "[un]cloud[] the . . . nature, severity and limiting effects of [plaintiff's mental] impairments."  [See AR at 215.]  The ME explained that his testimony at the 2014 Hearing regarding plaintiff's "moderate" functional limitations differed from his 2011 Hearing testimony that plaintiff had "marked" functional limitations, because the most recent records showed that plaintiff had "improved."  [AR at 60-61, 231.]  This necessarily implies that the ME believed that plaintiff's limitations actually were *worse* for some unspecified period of time prior to the 2014 Hearing date, perhaps going back to the time of the 2011 Hearing or before (and perhaps justifying the prior finding of "marked" limitations).  Further muddying the record, the ALJ adopted the ME's explanation and gave "little weight" to Dr. Rath's 2011 opinions because they were based on a "less complete medical file," while at the same time accepting Dr. Rath's 2014 Hearing explanation that "the most recent records show *significant* and generally sustained improvement" in plaintiff's condition.  [Id. (emphasis added).]  Again, if plaintiff had "significant[ly]" improved to the point that he had only moderate limitations in 2014, he must have had far greater limits in the past.  This finding of "significant" improvement is at odds with the ALJ's determination to give "little weight" to the ME's 2011 testimony.

Because Dr. Rath's opinion is not supported by or consistent with other evidence in the record, it may not serve as substantial evidence.  Andrews, 53 F.3d at 1041.  Remand is warranted on this issue.

### b.   Weight Given to Dr. Appelbaum's Opinion

An ALJ must consider all of the relevant evidence in the record and may not point to only those portions of the records that bolster his findings.  See, e.g., Holohan, 246 F.3d at 1207-08 (holding that an ALJ cannot selectively rely on some entries in plaintiff's records while ignoring others).  As the Ninth Circuit recently explained, "[c]ycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a

1  basis for concluding a claimant is capable of working." Garrison, 759 F.3d at 1017 (citing Holohan,

2  246 F.3d at 1205); see also Scott v. Astrue, 647 F.3d 734, 739-40 (7th Cir. 2011) (citations

3  omitted) ("There can be a great distance between a patient who responds to treatment and one

4  who is able to enter the workforce, and that difference is borne out in [the] treatment notes.  Those

5  notes show that although [plaintiff] had improved with treatment, she nevertheless continued to

6  frequently experience bouts of crying and feelings of paranoia.  The ALJ was not permitted to

7  'cherry-pick' from those mixed results to support a denial of benefits.").  Thus, "[r]eports of

8  'improvement' in the context of mental health issues must be interpreted with an understanding

9  of the patient's overall well-being and the nature of her symptoms." Garrison, 759 F.3d at 1017

10  (citing Ryan, 528 F.3d at 1200-01); see also Holohan, 246 F.3d at 1205 ("[The treating physician's]

11  statements must be read in context of the overall diagnostic picture he draws. That a person who

12  suffers from severe panic attacks, anxiety, and depression makes some improvement does not

13  mean that the person's impairments no longer seriously affect her ability to function in a

14  workplace.").

15       In this case, the ALJ gave "little weight" to Dr. Appelbaum's opinion that plaintiff has

16  numerous moderate to severe functional limitations, finding Dr. Appelbaum's opinions were not

17  supported by his own treatment records because the records reflected that plaintiff "greatly

18  benefited from the treatment provided to the point he is stable and his symptom spikes are easily

19  treated with minor medication adjustments." [AR at 233 (citing AR at 623, 630-31, 679, 754).]  He

20  also noted that the periodic six-month reports "show improvement in most areas in spite of the

21  continued notation that the claimant prefers to be alone or with his family." [Id. (citing AR at 696-

22  700 (six-month report dated August 2012), 744-49 (six-month report dated August 2013)).]  The

23  ALJ further found that "[i]n spite of" Dr. Appelbaum's clarification about plaintiff's history of drug

24  and alcohol use, "the file does not support those statements," as there are two records showing

25  plaintiff "actively engaging in marijuana and alcohol use and giving untrue statements about his

26  past use." [AR at 232 (citing AR at 546, 674).]  He concluded, therefore, that "the opinions from

27  Dr. Appelbaum regarding the co-effects or lack thereof of [plaintiff's] substance use disorder is [sic]

28  not supported by his own treatment records." [Id.]  As noted by the Appeals Council [AR at 215],

1   notwithstanding these single references in the record to alcohol or marijuana use, Dr. Appelbaum

2   specifically stated that plaintiff's use was historical in nature [AR at 649, 650], that there was no

3   "report of him having any *problems* related to the use of alcohol or drugs" [AR at 650 (emphasis

4   added)], and that in any event, "alcohol or polysubstances abuse *was not a factor and not material*

5   *to the level of . . . impairment* noted on the assessment form."  [AR at 650 (emphasis added).]

6   Thus, Dr. Appelbaum's opinions are not inconsistent even with these two records.  Accordingly,

7   this was not a specific and legitimate reason to discount Dr. Appelbaum's opinions.

8        Additionally, the ALJ appears to have selectively picked out a few isolated instances as

9   evidence of "improvement."  For instance, although on March 17, 2010, the record reflects that

10  plaintiff was generally doing well as reported by the ALJ [AR at 233 (citing AR at 623)], on May

11  8, 2010, he reported "some anxiety persisting" [AR at 627]; on June 29, 2010, his Wellbutrin was

12  increased "secondary to increasing periods of depression" [AR at 629]; on October 29, 2010, the

13  doctor noted "continuing chronic features of isolation and dependency" [AR at 634]; on November

14  29, 2010, he reported "continued periods of depression manifested by hopelessness and

15  anhedonia," "generally the same affect from prior visit one month ago," and "some periods of

16  anxiety and poor  sleep" [AR at 635]; and on February 8, 2011, he continued to complain of a poor

17  sleep pattern and continuing depressive features.  [AR at 638.]  Although the ALJ also points to

18  a February 17, 2012, note as showing that plaintiff has "*greatly* benefited from the treatment" [AR

19  at 233 (citing AR at 679) (emphasis added)], that note still reflects that plaintiff reported that he

20  felt a "little depressed," and was experiencing "minimal" anxiety or mood swings.[13]  [AR at 679.]

21

22  ---------------

[13]   Although the ALJ generally gave Dr. Appelbaum's opinions "little weight" when considering
23  the mental health records, when he discounted plaintiff's testimony that he "requires constant
    reminders to care for his personal care activities," the ALJ nevertheless gave "*[m]ore* weight" to
24  Dr. Appelbaum's notations in the periodic evaluation reports that indicated plaintiff "has no
    limitation in his daily activities."  [AR at 234 (emphasis added) (citing AR at 700, 748).]  What Dr.
25  Appelbaum's "notations" actually state are the following:  "Member presents as clean and
    manages his personal hygiene and responsibilities.  No impairment at this time" [AR at 700
26  (August 11, 2012, update)], and "Member takes care of his ADL's on his own.  There is no
    impairment at this time." [AR at 748 (August 20, 2013, update).]  The fact that plaintiff "takes care"
27  of his own hygiene is not inconsistent with his testimony that he needs reminders to do so.  Again,
28  the ALJ appears to be picking and choosing from the records to support his findings.

Moreover, a June 22, 2012, note a few months later noted "suspicious lesions" on plaintiff's face that indicate he was "picking on his skin," related to his depressive symptoms.  [AR at 679, 692.]

Next, although the ALJ contends that the periodic evaluations show "improvement in most areas in spite of the continued notation that [plaintiff] prefers to be alone or with his family" [AR at 233 (citing AR at 696-700 (August 16, 2012, periodic evaluation), 744-49 (August 20, 2013, periodic evaluation))], these evaluations do not reflect that alleged improvement.  For instance, the August 16, 2012, periodic evaluation, in addition to reflecting that plaintiff prefers to remain isolated at home to avoid social interaction with others, also reflects the following:  plaintiff is not able to sustain employment due to his "aggressive reaction to others"; he is "challenged by his anxiety which causes him to become overwhelmed in social situations," and to "react with frustration and aggressiveness"; although he went for daily walks for a number of months, he "stopped due to depression"; his "low frustration tolerance and depression" cause him to rely on his family for support; he has a short fuse and easily gets aggressive with others; he exhibits impulsiveness, racing thoughts, a tendency to be quick to anger, and an inability to control his anger outbursts; and due to his "depression and anxiety . . . he used poor judgment and was arrested and on probation."  [AR at 696-700.]  The August 20, 2013, evaluation reflects the following:  plaintiff continues to experience social anxiety when around others; he has become "somewhat disengaged from the program . . . result[ing] in . . . minimal growth toward his identified objective"; he continues to avoid responsibility; he exhibited "restless" motor activity and "poor" eye contact (as compared to the 2012 observation of "normal" motor activity and "good" eye contact [AR at 698]); his mood was evaluated as depressed (as compared to the 2012 finding of a "euthymic" mood [AR at 698]); his depressed mood and feelings of worthlessness cause him to rely on his family for support (a change -- but not an "improvement" -- from his 2012 report noting that his depression and low frustration tolerance cause him to rely on his family for support); his feelings of worthlessness and anxiety, and his belief that people are generally mistrustful, cause him to isolate at home (again, a change -- but not an "improvement" -- from his 2012 report noting that anxiety and low frustration tolerance result in his isolating behavior); he is not successful in work or school environments as he becomes overwhelmed and anxious, and is embarrassed that

1    he is not more independent, all resulting in continued barriers to attending school or working (a

2    change -- but not an "improvement" -- from his 2012 report that impulsiveness and racing

3    thoughts, as well as a tendency to be quick to anger and control his outbursts, were the factors

4    contributing to a lack of success in sustaining employment); because of his symptoms of

5    distractibility and disorganized thinking, he has little insight into the consequences of his probation

6    status and failure to pay his fines (a change -- but not an "improvement" -- from his 2012 report

7    that his symptoms of depression and anxiety resulted in poor judgment and an arrest and

8    probation); and, due to his symptoms of depression, anxiety and low frustration tolerance, he has

9    "continued to struggle with utilizing effective coping skills," and makes poor decisions, resulting

10   in him "not being able to stabilize his MI [mental impairment (or mental illness)], *exacerbating* his

11   symptoms and not being able to effectively reach out to others and learn new ways to cope with

12   his social anxiety." [AR at 744-48 (emphasis added).]

13       In short, when the 2013 assessment is compared to the 2012 assessment, there does not

14   appear to be improvement in *any area*, let alone in "most areas." [AR at 233.]  In fact, if anything,

15   the 2013 report reflects that plaintiff's symptoms are getting worse, not better.  Accordingly, this

16   was not a specific and legitimate reason to discount Dr. Appelbaum's opinions.

17       Finally, the ALJ discounts Dr. Appelbaum's opinions because his records "repeatedly"

18   reflect a Global Assessment of Functioning ("GAF")[14] score of 42, which equates to "serious

19   symptoms or serious impairment in social, occupational or school functioning." [AR at 233.]  The

20   ALJ, building on the previously discussed (and rejected) opinion of the "improvement" shown in

21   the record, states that plaintiff's "condition has improved with treatment,"  "his condition is noted

22   as stable," and "minor adjustments to his medications . . . help to re-stabilize his [increased]

23   symptoms by the next office visit." [Id.]  Thus, he gave the GAF scores little weight because they

24   _____

25       14   A GAF score is the clinician's judgment of the individual's overall level of functioning.  It is
26   rated with respect only to psychological, social, and occupational functioning, without regard to
     impairments in functioning due to physical or environmental limitations. Diagnostic and Statistical
27   Manual of Mental Disorders 32 (4th ed. 2000) ("DSM-IV").  The most recent edition of the DSM
     "dropped" the GAF scale, citing its "conceptual lack of clarity" and "questionable psychometrics
28   in routine practice."  Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2012).

1  do not "reflect the improvement observed in [plaintiff's] condition." [Id.]  As previously discussed,

2  even the records cited to by the ALJ do not reflect the sort of improvement the ALJ contends

3  occurred.  Therefore, for the same reasons previously discussed, this was not a specific and

4  legitimate reason to reject Dr. Appelbaum's opinions.

5         Remand is warranted on this issue.

6

7  **B.     CREDIBILITY AND LAY WITNESS TESTIMONY**

8         Plaintiff contends the ALJ failed to articulate legally sufficient reasons for rejecting the

9  testimony of plaintiff's sister, Marina Diaz [JS at 30-33], and in discounting plaintiff's subjective

10  symptom testimony.  [JS at 37-41, 46-47.]

11

12         **1.     Lay Witness Testimony**

13         In his 2014 Decision, the ALJ summarized the testimony of Ms. Diaz, who testified at the

14  July 28, 2011, hearing as follows:  she saw him regularly for the six months prior to the 2011

15  Hearing because she stops at her parent's house after dropping off her husband at the train

16  station and waits there until she picks him up again in the afternoon; he has poor sleep, poor

17  memory, poor energy, and poor concentration with limited follow through; he is uncomfortable

18  around people and prefers to isolate himself; and she has not observed him using illicit drugs but

19  did observe him with a beer about a month prior to the hearing.  [AR at 235 (citing AR at 170-78).]

20  The ALJ gave her testimony only "some weight," because (1) she does not live with plaintiff and

21  only sees him "after dropping her husband off," which "does not mean" she lives with plaintiff, and

22  "shows she does not have first-hand knowledge of all of his daily activities and routines because

23  she is not with him all the time"; and (2) although her testimony regarding plaintiff's tendency to

24  isolate is consistent with plaintiff's testimony, it is inconsistent with a June 3, 2010, third-party

25  function report from another friend, Francisco Cedillo, in which Mr. Cedillo states that he spends

26  about six hours a day with plaintiff.  [AR at 234-35.]

27

28

1   In determining the severity of a claimant's impairments and how the impairments affect his

2   ability to work, lay witness testimony[15] by friends and family members who have the opportunity

3   to observe a claimant on a daily basis "constitutes qualified evidence" that the ALJ must consider.

4   Sprague v. Bowen, 812 F.2d 1226, 1231-32 (9th Cir. 1987); accord Stout v. Comm'r of Soc. Sec.

5   Admin., 454 F.3d 1050, 1053 (9th Cir. 2006); Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir.

6   1996); 20 C.F.R. § 416.913(d)(4), (e).  Such testimony "is of particular value" because those who

7   see a claimant every day can often tell whether he is suffering or merely malingering.  Smolen,

8   80 F.3d at 1289 (citation omitted).  While an ALJ is not required "to discuss every witness's

9   testimony on a[n] individualized, witness-by-witness basis," Molina v. Astrue, 674 F.3d 1104, 1114

10  (9th Cir. 2012), he may discount the testimony of lay witnesses only for "reasons that are germane

11  to each witness."  Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993); Regennitter v. Comm'r of

12  Soc. Sec. Admin., 166 F.3d 1294, 1298 (9th Cir.1999).

13          The reasons given by the ALJ for discounting Ms. Diaz' testimony are not legally sufficient.

14  First, Ms. Diaz had seen her brother almost every day for the six months leading up to the 2011

15  Hearing and, therefore, her testimony is of "particular value."  Smolen, 80 F.3d at 1289.  Although

16  defendant argues that Ms. Diaz only saw plaintiff "briefly" while waiting to pick up her husband,

17  her testimony does not specify how much time she spent waiting at her parents' home -- in fact,

18  her testimony might just as easily be interpreted to mean that she drops her husband off in the

19  morning and waits at her parents' home to pick him up again in the afternoon.  [See AR at 170-78.]

20  Regardless, not only is there not a requirement that a third-party witness live with the claimant in

21  order for her testimony to be of "particular value," it appears that Ms. Diaz regularly witnessed

22  plaintiff's activities and was well-suited to provide her observations as to how his impairments have

23  affected his life.  Accordingly, without more, this was not a reason "germane" to this witness.

24          Next, the third party statement of Mr. Cedillo, stating that he spends about six hours a day

25  with plaintiff, was completed on June 3, 2010, well before Ms. Diaz' testimony at the hearing on

26

27  _____

28      [15]   Lay witnesses include spouses, parents and other care givers, siblings, other relatives,
    friends, neighbors, and clergy.  20 C.F.R. § 416.913(d)(4).

23

July 28, 2011.  The ALJ failed to mention that Mr. Cedillo also stated in his report that when he first met plaintiff, plaintiff was an "upbeat" and "very sociable" person, but that "[d]ue to unknown circumstance[s]," plaintiff has "become a person to himself." [Id.] Thus, *consistent* with Ms. Diaz' testimony [see, e.g., AR at 175 ([ATTY:] [H]as . . . your testimony about his behavior been fairly consistent during the last two years?  [MS. DIAZ:] Yes, it's just gotten worse unfortunately.")], Mr. Cedillo also reported changes in plaintiff's behavior over time.  [AR at 481.]  In fact, on the one hand, the ALJ discounted Mr. Cedillo's earlier testimony to the extent Mr. Cedillo reported limitations in plaintiff's daily activities, but on the other hand, he gave it "some weight" because it showed that plaintiff "is not as isolated as he alleges," and thereby affects plaintiff's credibility, as well as being allegedly inconsistent with Ms. Diaz' testimony.  [AR at 235.]  The ALJ's crediting of Mr. Cedillo's testimony when it supported the ALJ's findings and discounting it when it did not, also was not a reason "germane" to discount *Ms. Diaz*' testimony.

### 2.    Plaintiff's Credibility

The ALJ discounted plaintiff's testimony, stating the following:  (1) plaintiff's treatment history does not support his allegations about his physical impairments; (2) plaintiff's mental health records show he has "received benefits from [his treatment]  . . . to the point he has stabilized and when he does have increased symptoms they are easily addressed with minor adjustments to his medications," showing the lack of significance of his symptoms overall; (3) plaintiff's work activity report showing no significant earnings since 1997 demonstrates that he has a lack of motivation to work; (4) the inconsistencies in Ms. Diaz' testimony "affect[] [plaintiff's] credibility because of [plaintiff's] attempt to rely on her testimony in support of his disability application"; (5) plaintiff's statement that he has been clean and sober for six plus years is contradicted by his contrary statement in the record of marijuana and alcohol use, and by the testimony of Ms. Diaz who saw him drinking a beer in the month before the hearing, thereby demonstrating plaintiff's lack of "full sobriety"; and (6) Mr. Cedillo's statements that he spends six hours a day with plaintiff and that plaintiff needs help with chores and cooking, are inconsistent with plaintiff's testimony that he isolates from "all people in his room most of every day," as well as with Dr. Appelbaum's finding

1    that plaintiff has no limitations in his daily activities.  [AR at 235.]

2          "To determine whether a claimant's testimony regarding subjective pain or symptoms is

3    credible, an ALJ must engage in a two-step analysis."  <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028,

4    1035-36 (9th Cir. 2007).  "First, the ALJ must determine whether the claimant has presented

5    objective medical evidence of an underlying impairment 'which could reasonably be expected to

6    produce the pain or other symptoms alleged.'"  <u>Id.</u> at 1036 (quoting <u>Bunnell v. Sullivan</u>, 947 F.2d

7    341, 344 (9th Cir. 1991) (en banc)).  Second, if the claimant meets the first test, the ALJ may

8    reject the claimant's testimony about the severity of her symptoms "only upon (1) finding evidence

9    of malingering, or (2) expressing clear and convincing reasons for doing so."  <u>Benton v. Barnhart</u>,

10   331 F.3d 1030, 1040 (9th Cir. 2003).  Factors to be considered in weighing a claimant's credibility

11   include:  (1) the claimant's reputation for truthfulness; (2) inconsistencies either in the claimant's

12   testimony or between the claimant's testimony and her conduct; (3) the claimant's daily activities;

13   (4) the claimant's work record; and (5) testimony from physicians and third parties concerning the

14   nature, severity, and effect of the symptoms of which the claimant complains.  <u>See</u> <u>Thomas v.</u>

15   <u>Barnhart</u>, 278 F.3d 947, 958-59 (9th Cir. 2002); <u>see</u> <u>also</u> <u>Ghanim</u>, 763 F.3d at 1163; 20 C.F.R. §

16   404.1529(c).

17         Where, as here, plaintiff has presented evidence of an underlying impairment, and the ALJ

18   did not find "affirmative evidence" of malingering [<u>see</u> <u>generally</u> AR at 229-35], the ALJ's reasons

19   for rejecting a claimant's credibility must be specific, clear and convincing.  <u>Burrell v. Colvin</u>, 775

20   F.3d 1133, 1136 (9th Cir. 2014) (citing <u>Molina</u>, 674 F.3d at 1112);  <u>Brown-Hunter v. Colvin</u>, 806

21   F.3d 487, 488-89 (9th Cir. 2015).  "General findings [regarding a claimant's credibility] are

22   insufficient; rather, the ALJ must identify what testimony is not credible and what evidence

23   undermines the claimant's complaints."  <u>Burrell</u>, 775 F.3d at 1138 (quoting <u>Lester</u>, 81 F.3d at 834)

24   (quotation marks omitted).  The ALJ's findings "'must be sufficiently specific to allow a reviewing

25   court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and

26   did not arbitrarily discredit a claimant's testimony regarding pain.'"  <u>Brown-Hunter</u>, 806 F.3d at 493

27   (quoting <u>Bunnell</u>, 947 F.2d at 345-46).  A "reviewing court should not be forced to speculate as

28   to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain."  <u>Bunnell</u>,

1    947 F.2d at 346.  As such, an "implicit" finding that a plaintiff's testimony is not credible is

2    insufficient.  Albalos v. Sullivan, 907 F.2d 871, 874 (9th Cir. 1990) (per curiam).

3         The Court has previously discussed the problems with the ALJ's findings that plaintiff's

4    mental health treatment records show improvement, and of alleged inconsistencies in Ms. Diaz'

5    testimony.  In addition to these problems with the ALJ's reasons for discounting plaintiff's

6    testimony, the ALJ does not explain how a lack of earnings since 1997 shows a lack of motivation

7    to work, rather than simply reflecting an inability to work because of mental health or other

8    impairments.  In fact, plaintiff stated in his application that his date of onset was April 1, 1995, well

9    before he stopped having earnings.  [AR at 197.]  Next, the ALJ mischaracterizes Ms. Diaz'

10   testimony about plaintiff's alleged beer drinking:  although the ALJ states that Ms. Diaz "observed

11   [plaintiff] consuming alcohol within a month of the first hearing" [AR at 235], Ms. Diaz actually

12   testified that although she saw him get a beer, all he did was pick up the beer, "put it down," and

13   go back to his room, without drinking any of it "at all."  [AR at 175-76.]

14        Based on the foregoing, the ALJ's reasons for discounting plaintiff's testimony are not

15   specific, clear, and convincing.

16        Because the matter is being remanded for reconsideration of the medical opinions, and the

17   ALJ on remand as a result must reconsider plaintiff's RFC in light of the record evidence, on

18   remand the ALJ must also provide specific, clear and convincing reasons for discounting plaintiff's

19   subjective symptom testimony, if warranted.  See Treichler v. Comm'r of Soc. Sec. Admin., 775

20   F.3d 1090, 1103 (9th Cir. 2014)  (citation omitted) (the "ALJ must identify the testimony that was

21   not credible, and specify 'what evidence undermines the claimant's complaints.'"); Brown-Hunter,

22   806 F.3d at 493-94 (the ALJ must identify the testimony he found not credible and "link that

23   testimony to the particular parts of the record" supporting his non-credibility determination).

24

25   **C.     HEPATITIS C**

26        Plaintiff notes that in his 2011 Decision the ALJ found plaintiff had the severe impairment

27   of hepatitis C, but that in the 2014 Decision, he found this was not a severe impairment.  [JS at

28   48.]  In the 2014 Decision, the ALJ found that hepatitis C was not a severe impairment because

the record "shows no specific treatment sought or received . . . for this impairment" and, therefore, "it can be presumed that he has no active symptoms that require medical attention."  [AR at 226.] Neither did the ALJ find any objective records supporting plaintiff's complaints regarding significant physical issues he is suffering secondary to hepatitis C.  [Id.]

Because the matter is being remanded for reconsideration of the medical opinions, plaintiff's credibility, and Ms. Diaz' testimony, on remand the ALJ must also reconsider whether the evidence supports hepatitis C as a severe impairment.

## VI.

## REMAND FOR FURTHER PROCEEDINGS

The Court has discretion to remand or reverse and award benefits.  McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989).  Where no useful purpose would be served by further proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits.  See Lingenfelter, 504 F.3d at 1041; Benecke v. Barnhart, 379 F.3d 587, 595-96 (9th Cir. 2004).  Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate.  See Benecke, 379 F.3d at 593-96.

In this case, there are outstanding issues that must be resolved before a final determination can be made.  In an effort to expedite these proceedings and to avoid any confusion or misunderstanding as to what the Court intends, the Court will set forth the scope of the remand proceedings.  First, if necessary to fully and fairly develop the record, the ALJ on remand[16] shall obtain additional medical evidence including, if warranted, a consultative mental status

---

[16]   Internal policy of the Social Security Administration provides that on remand from the Appeals Council, including remands generated by the Court, the proceedings are held before the previously assigned ALJ, unless the case previously was assigned to that ALJ on a prior remand and the ALJ's decision after remand is the subject of the new remand, or the Appeals Council expressly directs the case to be assigned to a different ALJ.  HALLEX I-2-1-55(D)(6).  The record herein may warrant the matter being assigned to a different ALJ and ME.

examination, and the testimony of a medical expert.  Second, because the ALJ failed to provide specific and legitimate reasons for discounting the opinions of Dr. Appelbaum, instead giving "great weight" to the opinions of the non-examining medical expert, the ALJ on remand shall reassess the opinions of these physicians.  In assessing the medical opinion evidence of all of the doctors, the ALJ must explain the weight afforded to each opinion and provide legally adequate reasons for any portion of the opinion that the ALJ discounts or rejects, including a legally sufficient explanation for crediting one doctor's opinion over any of the others.  Third, because the ALJ failed to provide specific, clear and convincing  reasons, supported by substantial evidence in the case record, for discounting plaintiff's subjective symptom testimony, the ALJ on remand shall reassess plaintiff's subjective allegations and either credit his testimony as true, or provide specific, clear and convincing reasons, supported by substantial evidence in the case record, for discounting or rejecting any testimony.  Fourth, the ALJ shall reconsider the third-party testimony of Ms. Diaz and provide reasons germane to this witness for discounting her testimony, if warranted.  Finally, the ALJ shall reassess plaintiff's RFC and determine, at step five, with the assistance of a VE if necessary, whether there are jobs existing in significant numbers in the national economy that plaintiff can still perform.[17]

/

/

/

/

/

/

---

[17]   Nothing herein is intended to disrupt the ALJ's step four finding that plaintiff has no past work.

**VII.**

**CONCLUSION**

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  August 3, 2016

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE